UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

BORIS KOTLYARSKY,

                                        Movant,

                -against-                                       18-cv-1746 (LAK)
                                                                [16-cr-0215 (LAK)]

UNITED STATES OF AMERICA,

                                        Respondent.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 5/2/2019

## MEMORANDUM OPINION

               Appearances:

                            Akiva Shapiro
                            AKIVA SHAPIRO LAW, PLLC
                            *Attorney for Movant*

                            Andrew Mark Thomas
                            Assistant United States Attorney
                            GEOFFREY S. BERMAN
                            UNITED STATES ATTORNEY
                            *Attorneys for Respondent*


LEWIS A. KAPLAN, *District Judge.*

               On October 27, 2016, Boris Kotlyarsky pleaded guilty to one count of conspiracy to

commit Hobbs Act extortion in violation of 18 U.S.C. § 1951, and one count of aiding and abetting

Hobbs Act extortion in violation of 18 U.S.C. §§ 1951 and 2. On May 31, 2017, the Court sentenced

Kotlyarsky to 41 months' imprisonment. This matter now is before the Court on Kotlyarksy's

motion to vacate his conviction or reduce his sentence to time served, pursuant to 28 U.S.C. § 2255

2

[DI 1].[1]

*Background*

*The Offense Conduct*

In January, 2016, the government filed a criminal complaint alleging that Kotlyarsky brokered a deal between Boris Nayfeld and Oleg Mitnik, wherein Mitnik agreed to pay Nayfeld approximately $125,000 in exchange for Nayfeld's promise to halt a pending contract for Mitnik's murder.[2] The murder contract was ordered by a Russian businessman named Anatoly Potik, who was Mitnik's father-in-law.[3] Kotlyarsky knew Nayfeld through Potik.[4] Kotlyarsky learned that Potik planned to hire Nayfeld to kill someone and discerned that the intended victim was Mitnik.[5] Kotlyarsky informed Mitnik of the pending murder contract and arranged meetings between Nayfeld and Mitnik.[6] Kotlyarsky believed that Nayfeld would demand money from Mitnik to halt the murder

---

[1]
Document identification ("DI") numbers refer to the civil docket [18-cv-1746] unless otherwise indicated.

While Kotlyarsky's initial request for relief was broader, he has since amended his request for relief to "exclude the setting aside of the Judgment of Conviction if it will only lead to a new trial." DI 11 at ¶ 11.

[2]
[16-cr-0215] DI 1.

[3]
DI 2 at 5.

[4]
*Id.*

[5]
*Id.* at 6; [16-cr-0215] DI 71-8 at 16-17.

[6]
[16-cr-0215] DI 71-8 at 17.

Case 1:16-cr-00215-LAK   Document 82   Filed 05/02/19   Page 3 of 20
Case 1:18-cv-01746-LAK   Document 16   Filed 05/02/19   Page 3 of 20

3

contract, and that due to Nayfeld's criminal reputation, Mitnik would likely pay the money that Nayfeld demanded.[7]

Unbeknownst to Kotlyarsky or to Nayfeld, Mitnik contacted law enforcement after Kotlyarsky informed him of the existence of the murder contract.[8]  Subsequent meetings and communications that Mitnik had with Kotlyarsky and Nayfeld relating to the murder contract were recorded.[9]  Mitnik agreed to pay Nayfeld the first $50,000 payment toward the agreed-upon sum of $125,000 at an in-person meeting.[10]  At that meeting, Mitnik wrote a check for $50,000 and gave it to Nayfeld.[11]  Upon leaving the restaurant where the meeting took place, the FBI arrested Nayfeld.[12]  Shortly thereafter, Kotlyarsky was arrested also.[13]  On March 16, 2016, the government filed an indictment charging Kotlyarsky with one count of conspiracy to commit Hobbs Act extortion and one count of Hobbs Act extortion.[14]  Kotlyarsky consistently has maintained that he would not receive any financial gain from the extortion plot and that he brokered the meetings between Mitnik and

---

[7] *Id.*

[8] DI 2 at 7.

[9] *Id.* at 7-10.

[10] *Id.* at 10.

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] [16-cr-0215] DI 16.

4

Nayfeld solely to avert the murder of Mitnik.

### The Superseding Indictment

The government filed a superseding indictment against Kotlyarsky on October 5, 2016. At that time, his trial was scheduled to begin on November 7, 2016. The superseding indictment charged that, in addition to the plot relating to the murder contract, Kotlyarsky and Nayfeld conspired to commit extortion also by agreeing to use Nayfeld's "reputation for violence and association with organized crime figures to recover Kotlyarsky's business interests in Russia."[15] Additionally, the superseding indictment contained a new count of attempted witness tampering, alleging that:

> "Kotlyarsky, believing that [Nayfeld] would testify against him at trial, contacted [Nayfeld's] relative to provide [Nayfeld] with a false affidavit for [Nayfeld] to sign and to encourage [Nayfeld] not to testify by emphasizing that [Nayfeld's] reputation would be ruined and promising to sue [Mitnik] and to share the expected monetary award with [Nayfeld's] family."[16]

The government moved for the revocation of Kotlyarsky's bail upon filing the superseding indictment. Following a hearing on October 13, 2016, the Court revoked Kotlyarsky's bail pending trial.

### Nayfeld's Plea

On October 12, 2016, Nayfeld pleaded guilty to one count of conspiracy to commit Hobbs Act extortion and one count of Hobbs Act extortion before Judge Katherine B. Forrest. In

---

[15]   [16-cr-0215] DI 35 at ¶ 3.

[16]   *Id.* at ¶ 5.

5

his plea allocution, Nayfeld stated, *inter alia*, that "[i]t was [his] intention to share the money with [Kotlyarsky] but he said no."[17]   Judge Forrest ordered the transcript sealed at the request of the government.

*Plea Negotiations and Agreement*

Shortly after Kotlyarsky's bail was revoked, his lawyers resumed plea negotiations with the government.   On October 22, 2016, the government communicated to Kotlyarsky's lawyers its position that Kotlyarsky would face a guidelines range of 97 to 121 months' imprisonment if he were convicted at trial.   On October 25, the government communicated a formal plea offer to Kotlyarsky's lawyer indicating that it would accept Kotlyarsky's plea to Count One of the superseding indictment, with a stipulated guidelines range of 70 to 87 months' imprisonment. Negotiations continued, and the next day the government emailed a new plea agreement to Kotlyarsky's lawyer indicating that it would accept Kotlyarsky's plea to Counts One and Two of the original indictment, with a stipulated guidelines range of 41 to 51 months' imprisonment.   Upon sending Kotlyarsky's lawyer the new plea agreement at 10:26 a.m., the government stated that the offer would expire at the end of the day.[18]

Kotlyarsky accepted the government's plea offer of October 26.   By entering into the agreement, Kotlyarsky agreed that he would

> "not file a direct appeal; nor bring a collateral challenge, including but not limited to an application under Title 29, United States Code, Section 2255 and/or Section 2241; nor seek a sentence modification pursuant to Title 18, United States Code, Section

---

[17]   [16-cr-0215] DI 71-5 at 46:9-10.

[18]   [16-cr-0215] DI 77.

6

3582(c), of any sentence within or below the Stipulated Guidelines Range of 41 to 51 months' imprisonment."[19]

The plea agreement provided also that:

> "[t]he defendant hereby acknowledges that he has accepted this Agreement and decided to plead guilty because he is in fact guilty. By entering this plea of guilty, the defendant waives any and all right to withdraw his plea or to attack his conviction, either on direct appeal or collaterally, on the ground that the Government has failed to produce any discovery material, *Jencks* Act material, exculpatory material pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), other than information establishing the factual innocence of the defendant."[20]

On October 27, the defendant appeared before U.S. Magistrate Judge Kevin Nathaniel Fox for a change of plea. He there confirmed that he understood the terms of the plea agreement, that he was satisfied with the assistance that his attorney provided to him, and that he in fact committed the offenses set forth in the indictment. Kotlyarsky stated that he had not stood to gain financially from his participation in the offense conduct and that he wanted to "prevent the tragedy and save human being [sic] lives" through his actions.[21]

Kotkyarsky acknowledged that he knew at the time that what he was doing was wrong, that he suspected that an agreement would be made to prevent the killing in exchange for a demand of money, and that he aided and abetted in the procurement of that money. The government invited Judge Fox to inquire further if Kotlyarsky intended to create a circumstance whereby money would be demanded and paid. At first, Kotlyarsky responded that he "suspected" that money would

---

[19]
    [16-cr-0215] DI 71-7 at 4.

[20]
    *Id.* at 5.

[21]
    [16-cr-0215] DI 71-8 at 18.

7

be demanded and paid.[22]   Judge Fox inquired further if Kotlyarsky "intended" to create a circumstance through his actions whereby money would be demanded and paid, to which Kotlyarsky responded that he did.[23] This Court accepted Kotlyarsky's guilty plea and later sentenced Kotlyarksy to 41 months' imprisonment.  Kotlyarsky did not appeal his conviction or sentence.

*Mitnik's Affidavit*

Mitnik submitted an affidavit accompanying Kotlyarsky's present motion, stating, *inter alia*, that (1) "[a]t no point did [] Kotlyarsky ever ask [Mitnik] or lead [Mitnik] to believe that he expected in any way to be compensated financially," (2) Mitnik believes that but for Kotlarsky's intervention, he would "not be alive today," (3) Mitnik does "not believe that [] Kotlyarsky should have been charged with extortion in the first place," (4) it was Mitnik's idea, and not Kotlyarsky's, for Mitnik to meet with Nayfeld, (5) Mitnik asked Kotlyarsky to arrange the meetings with Nayfeld, (6) Kotlyarsky had told Mitnik that he "should go to the police to get them involved," and (7) Kotlyarsky's 41 month sentence of imprisonment constitutes "a gross miscarriage of justice."[24]

*The Claims*

In his current motion, Kotlyarsky argues that he is entitled to 28 U.S.C. § 2255 relief for a variety of reasons.  His principal arguments allege that: (i) the Court lacked subject matter

---

22

*Id.* at 20:18-25.

23

*Id.* at 21:1-9.

24

DI 2 at ECF 62-66.

8

jurisdiction over his case because the conduct at issue did not affect interstate commerce, (ii) he received ineffective assistance of counsel both when entering into the plea agreement and at sentencing, (iii) the government violated its Brady obligations and wrongfully caused him to enter into the plea agreement under duress, and (iv) the "restrictive terms" of the plea agreement should be invalidated because they are ambiguous.

## Discussion

### Legal Standard

Relief under Section 2255 is appropriate if the movant can show, among other things, that his "sentence was imposed in violation of the Constitution or laws of the United States," or "that the sentence was in excess of the maximum authorized by law."[25]

### Effect of Interstate Commerce

#### Subject Matter Jurisdiction

Kotlyarsky argues that the Court lacks subject matter jurisdiction over this case because there was no connection between the alleged act of extortion and interstate commerce.[26] "In order to sustain a challenge to the district court's jurisdiction, the defendant who has pleaded guilty must establish that the face of the indictment discloses that the count or counts to which he pleaded

---

[25]

28 U.S.C. § 2255(a).

[26]

DI 7 at 8-17.

9

guilty failed to charge a federal offense."[27]  The indictment to which Kotlyarsky pleaded guilty[28]

tracked the language of 18 U.S.C. § 1951.[29]  Kotlyarsky's claim challenging the Court's jurisdiction

therefore fails.[30]

*Rule 11*

      Although Kotlyarsky's interstate commerce argument is framed as an attack on the

Court's subject matter jurisdiction, it can be construed also as a claim under Rule 11 of the Federal

---

[27]

      *Hayle v. United States*, 815 F.2d 879, 881 (2d Cir. 1987) (citation omitted); *accord United States v. Yousef*, 750 F.3d 254, 259 (2d Cir. 2014).

[28]

      [16-cr-0215] DI 16.

[29]

      18 U.S.C. § 1951(a) provides:

      "Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both."

      "Extortion" is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."  *Id.* § 1951(b)(2).

[30]

      Kotlyarsky's claim that "more is required than merely tracking the statute," DI 11 at 5, is incorrect as a matter of law.  A court's inquiry as to whether an indictment charges a federal offense for the purposes of establishing subject-matter jurisdiction is "exceedingly narrow." *Yousef*, 750 F.3d at 259 (citation omitted).  "Defects in an indictment short of a failure to charge all of the statutory elements do not undermine subject-matter jurisdiction, and do not implicate the power of the federal courts to decide a case." *Id.* (citation omitted).  Indeed, "[e]ven a defendant's persuasive argument that the conduct set out in the indictment does not make out a violation of the charged statute does not implicate subject-matter jurisdiction." *Id.* at 260 (citation omitted).

10

Rules of Criminal Procedure that there was an insufficient factual basis for his plea.[31] Kotlyarsky failed to raise this argument on direct appeal. It therefore is procedurally barred unless he "establishes (1) cause for the procedural default and ensuing prejudice or (2) actual innocence."[32] Kotlyarsky has not established either.

Kotlyarsky's Rule 11 claim would fail even if the Court were to consider its merits. The core of Kotlyarsky's argument relies on the distinction drawn in *United States v. Perrotta*[33] between the extortion of an individual and the extortion of a business for purposes of establishing Hobbs Act jurisdiction, and the Court's holding that "[m]erely showing employment with a company that does business in interstate commerce, without more, stretches the Hobbs Act too far."[34]

Hobbs Act jurisdiction depends on a nexus to interstate commerce. But "the required showing of an effect on interstate commerce is *de minimis*."[35] When the target of an extortion plot is an individual, the interstate commerce element of the Hobbs Act is satisfied:

> "(i) where the victim directly participated in interstate commerce; (ii) where the defendant targeted the victim because of her status as an employee at a company participating in interstate commerce; (iii) where the assets of a company engaged in interstate commerce were, or would have been, depleted as a result of the harm or potential harm, respectively, to the individual victim; or (iv) where the defendant targeted the assets of a business engaged in interstate commerce rather than an

---

[31]  *United States v. Adams*, 448 F.3d 492, 497 (2d Cir. 2006); *see also* Fed. R. Crim. P. 11(b)(3).

[32]  *United States v. Thorn*, 659 F.3d 227, 231 (2d Cir. 2011); *accord DeJesus v. United States*, 161 F.3d 99, 102 (2d Cir. 1998).

[33]  313 F.3d 33 (2d Cir. 2002).

[34]  *Id.* at 38.

[35]  *United States v. Parkes*, 497 F.3d 220, 230 (2d Cir. 2007).

11

individual."[36]

There was an adequate factual basis for Kotlyarsky's plea. First, Kotlyarksy stated at the plea conference that he "understood that [his actions] could affect interstate commerce."[37] Additionally, the criminal complaint, filed on January 15, 2016, alleged that Mitnik wrote the $50,000 check used to pay Nayfeld from his New Jersey-based business account.[38] Furthermore, the complaint and the Presentence Investigative Report ("PSR"), which was adopted by the Court, state that (1) Mitnik operated an international shipping business located in Newark, New Jersey, (2) the payment demanded of Mitnik would have affected his business, and (3) Kotlyarsky and Nayfeld both discussed Mitnik's business with Mitnik on cell phone calls and during meetings."[39]

Kotlyarsky argues that the government "manufactured" the alleged nexus between the extortion scheme and interstate commerce by directing Mitnik to write the $50,000 check from his business account.[40] In support of this allegation, Kotlyarsky proffers an email sent by Mitnik to Kotlyarsky's counsel on March 26, 2018. Kotlyarsky's counsel asked Mitnik whether he had been told by anyone in the government to use his business account to write the check or whether he had made that decision on his own. Mitnik responded as follows:

---

[36]

*Untied States v. Wilkerson*, 361 F.3d 717, 729 (2d Cir. 2004) (quoting *Perrotta*, 313 F.3d 33, 37-38).

[37]

DI 49 at 18:8-19:13.

[38]

[16-cr-0215] DI 1 at 6.

[39]

*Id.* at 6-7; [16-cr-0215] DI 54 at ¶ 22.

[40]

DI 11 at 6-7.

12

"I don't remember how exactly it went down. But this is what I remember[.] Originally I was supposed to bring cash[.] At least that was my understanding[.] FBI told me not to worry about. Then, like a day before the meeting they told me to bring a check. I told FBI I didn't have $50,000 on my personal account and they told me to write from business. Something like that."[41]

On its face, this evidence does not support Kotlyarsky's allegation that the government "manufactured" the nexus between the extortion scheme and interstate commerce. But even if the Court were to omit the fact of Mitnik writing the check from his business account in the interstate commerce analysis, Kotlyarsky's plea allocution, coupled with the remaining allegations in the criminal complaint and the PSR, are more than sufficient to support the "de minimis" interstate commerce requirement. In fact, Mitnik's statement that the payment demanded of him would have affected his business would be sufficient standing alone.[42]

*Ineffective Assistance of Counsel*

   *During Plea Negotiations*

Kotlyarsky argues that he received ineffective assistance of counsel during plea negotiations because his lawyers failed to investigate the potential testimony of Nayfeld and Mitnik before he entered into the plea agreement.[43] He contends that if he had known what their testimony would have been, he would not have entered into the plea agreement. To the extent that this

---

41

  DI 11-1.

42

  "[A] robbery or extortion that depletes the assets of a business operating in interstate commerce will satisfy the jurisdictional requirement of the Hobbs Act by a minimal showing of effect on commerce." *United States v. Jamison*, 299 F.3d 114, 120 (2d Cir. 2002).

43

  DI 7 at 21-30.

13

argument relates to Nayfeld, Kotlyarsky focuses on Nayfeld's statement at his plea hearing before Judge Forrest that "it was his intention to share the money with [Kotlyarsky] but [Kotlyarsky] said no." Regarding Mitnik, he focuses on the statements contained in the affidavit that Mitnik submitted in support of his current motion.

On November 5, 2018, the Court directed the government to request written statements from Kotlyarsky's prior counsel to address his "allegations of ineffective assistance with respect to his decision to enter into a plea agreement with the government."[44] The two attorneys who represented Kotlyarsky at the time submitted affidavits establishing the timeline of their plea negotiations with the government and that it was Kotlyarsky's intention to seek a plea agreement.[45] The affidavits did not address any steps that his lawyers did or did not take to speak to potential witnesses prior to Kotlyarsky's entering into the plea agreement.

"[T]he two-part *Strickland v. Washington* test applies to challenges to guilty pleas based on ineffective assistance of counsel."[46] To prevail, the defendant must (1) show that his counsel's representation fell below "an objective standard of reasonableness," and (2) "affirmatively prove prejudice."[47] There is no need to examine the first prong, as Kotlyarsky has not satisfied the second.

As the Supreme Court has stated:

---

[44]   DI 12.

[45]   [16-cr-0215] DI 80.

[46]   *Hill v. Lockhart*, 474 U.S. 52, 58 (1985).

[47]   *Strickland v. Washington*, 466 U.S. 668, 687-88, 693-94 (1984).

14

> "in order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.
>
> In many guilty plea cases, the 'prejudice' inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial. For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error 'prejudiced' the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial."[48]

First, the relevant portion of Nayfeld's testimony already was known to Kotlyarsky and his lawyers at the time he entered into the plea agreement. On October 1, 2016, the government sent Kotlyarsky's lawyers a letter stating that "a witness has informed the Government, in sum and substance, that the defendant was offered direct payment in connection with the events described in the Indictment, but declined the offer."[49] While Kotlyarsky acknowledges receiving this letter, he argues that it was insufficient because it did not disclose the identity of the witness. This argument fails for two reasons. First, Kotlyarsky, for obvious reasons, knew that Nayfeld had made an offer of payment to him and that he had declined that offer. Second, the record demonstrates that Kotlyarsky's counsel believed that Nayfeld was the witness referred to in that letter. During Kotlyarsky's bail revocation hearing, his counsel mentioned the letter and stated that the witness referred to in the letter "presumably" was Nayfeld.[50] Therefore, Kotlyarsky's knowledge of

---

[48]
    *Lockhart*, 474 U.S. at 59.

[49]
    [16-cr-0215] at DI 71-3.

[50]
    [16 cr-0215] DI 46 at 27:7-15.

15

Nayfeld's statement at his plea hearing would not have changed the calculus as to whether he should proceed to trial. In fact, at that hearing, Judge Forrest accepted Nayfeld's guilty plea of conspiring to commit extortion with Kotlyarsky. This testimony is *inculpatory*, not exculpatory. It certainly would not have changed the result.

Mitnik's current professed views, even if he held them at the time of Kotlyarsky's plea, would not have changed the result either. Even if Mitnik believed that Kotlyarsky should not have been charged with the crime of extortion, nothing in his affidavit changes the fact that Kotlyarsky did in fact aid and abet the commission of the extortion plot. Therefore, even if Kotlyarsky's lawyers had learned everything that Mitnik later put in his affidavit before entering into the plea agreement, it would not have changed the calculus of whether Kotlyarsky should have proceeded to trial on the charges against him, let alone been acquitted.[51]

*At Sentencing*

Kotlyarsky argues also that he received ineffective assistance of counsel at sentencing.

First, he argues that counsel failed to object to the obstruction of justice enhancement in the PSR and failed to seek a mitigating role reduction with respect to his sentencing guidelines range.[52] This argument is unpersuasive. The plea agreement that Kotlyarsky entered into contained a stipulated guidelines range, which included the enhancement for obstruction of justice and did not include a mitigating role reduction. Kotlyarsky's lawyers therefore were foreclosed from advancing

---

[51] This conclusion is reinforced further by the fact that the superseding indictment included additional allegations of extortion conspiracy having nothing to do with the Mitnik murder-for-hire scheme.

[52] DI 7 at 30-40.

16

either of these arguments at sentencing.

Next, Kotlyarsky argues that the alleged failure of his counsel to investigate the potential testimony of Nayfeld and Mitnik prejudiced him at sentencing because the Court would have credited his "selflessness" argument had it known about Nayfeld's sealed allocution and Mitnik's views. This argument fails because the Court already was aware of this information at sentencing and considered it fully when imposing Kotlyarsky's sentence. Regarding the relevant part of Nayfeld's testimony, the government indicated in its sentencing submission that Kotlyarsky had been offered, but declined to take, a cut of the payment from Mitnik to Nayfeld.[53] Regarding Mitnik's view of Kotlyarsky's role in the scheme, the PSR included Mitnik's statements to probation that (1) Kotlyarsky never asked for or expected to be compensated financially, (2) he did not believe that Kotlyarsky should have been charged with extortion, and (3) he believes that if Kotlyarsky did not intervene in the scheme, he would be dead.[54]

The Court did not accept Kotlyarsky's argument at sentencing that he acted solely based on altruistic motives. It reached its conclusion based on Kotlyarsky's other business interests with Nayfeld at the time, his discussions of other potential business during his meetings with Mitnik, and the observation that by ingratiating himself with both Nayfeld and Mitnik through the extortion scheme, Kotlyarsky "saw . . . a situation of which [he] could take advantage" so that "at the end of the day, in one way or another, there would be an economic benefit to [him] no matter how it turned

---

[53]    [16-cr-0215] DI 58 at 9.

[54]    [16-cr-0215] DI 54 at ¶ 27.

out,"[55] regardless of whether he received a direct payment from the extortion plot.

*Alleged Government Misconduct*

   *Brady Violations*

         Kotlyarsky re-purposes many of the facts in support of his ineffective assistance of

counsel arguments into *Brady* arguments.  By entering into the plea agreement, Kotlyarsky waived

the right to attack his conviction "on the ground that the Government has failed to produce any

discovery material, *Jencks* Act material, exculpatory material pursuant to *Brady v. Maryland*, 373

U.S. 83 (1963), other than information establishing the factual innocence of the defendant."[56]

         Kotlyarsky first argues that the government violated *Brady* by not disclosing the

testimony given by Nayfeld at his plea hearing.  This argument fails because Nayfeld's testimony

does not establish Kotlyarsky's factual innocence.  To the contrary, it established that Nayfeld

conspired with Kotlyarsky to commit extortion.[57]  Kotlyarsky argues that the government was

obligated to produce Nayfeld's statement that "[i]t was [his] intention to share the money with

[Kotlyarsky] but he said no."  As discussed above, the government sent Kotlyarsky's counsel a letter

which advised that "a witness ha[d] informed the Government, in sum and substance, that the

defendant was offered direct payment in connection with the events described in the Indictment, but

declined the offer."  Additionally, the intention of Nayfeld to share money from the extortion plot

---

[55]
         [16-cr-0215] DI 61at 17:15-19.

[56]
         [16-cr-0215] DI 71-7at 5.

[57]
         As the transcript remains sealed, we note that it would be accessible to a reviewing court.

18

with Kotlyarsky and Kotlyarsky's declination of that offer does not establish Kotlyarsky's innocence with respect to the charges of conspiracy to commit and aiding and abetting extortion.

Kotlyarsky argues also that the government knew that Mitnik did not believe that Kotlyarsky had violated the law and should not have been charged with extortion, but did not disclose this evidence to Kotlyarsky.[58] This argument fails because the subjective impressions such as these of the victim of the extortion plot would have had no bearing on whether Kotlyarsky is in fact guilty of the charges against him.  Additionally, the victim's perspective that Kotlyarsky's actions kept him from being killed is reflected in the criminal complaint.[59]

*Duress*

Kotlyarsky argues that the plea agreement should be set aside because he agreed to plead guilty under duress caused by the government.  The alleged duress "was the threat, to an innocent man, at the age of 69, of ten years of imprisonment,"[60] effectuated by the government's (1) *Brady* violations, (2) aggressive plea negotiations in which defendant was given two hours to accept the plea agreement, (3) the issuance of a superseding indictment and contemporaneous motion to revoke bail, and (4) violation of Local Civil Rule 1.6.[61]

---

[58]

DI 7 at 43, 44-45.

[59]

"The Victim believes that the Victim's conversations with Nayfeld and Kotlyarsky have kept the Victim from being killed." [16-cr-0215] DI 1 at 6.

[60]

DI 7 at 42.

[61]

*Id.* at 43-49.  Kotlyarsky asserts also that he was offered an opportunity to cooperate, but refused, and that the government "set out with new vigor to see to it that he was punished." *Id.* at 48.

19

As discussed *supra*, there is no evidence to support the allegation that the government violated its *Brady* obligations. As to Kotlyarsky's argument relating to the timing of the plea negotiations, the government submitted an affidavit stating that it emailed the plea agreement to Kotlyarsky's counsel at 10:26 a.m. and that the offer expired at the end of the day. There was nothing improper about the time-frame imposed by the government. The argument that the government filed a superseding indictment and moved to revoke Kotlyarsky's bail as a tactic to coerce his guilty plea is facially invalid. The same goes for the argument that the government failed to alert the court of facts pursuant to a local civil rule aimed at ensuring judicial economy in order to secure a criminal guilty plea under duress.

*Language in the Plea Agreement*

Kotlyarsky challenges the "restrictive terms of the Plea Agreement on the basis that the agreement, as written, is ambiguous" because the plea agreement simultaneously stated that defendant (1) has accepted the agreement and decided to plead guilty because he is in fact guilty, and (2) did not waive his right to attack his conviction on the basis of a *Brady* violation related to information establishing his factual innocence.[62] This argument is without merit because these

---

Local Civil Rule 1.6 provides, in relevant part:

"(a) It shall be the continuing duty of each attorney appearing in any civil or criminal case to bring promptly to the attention of the Court all facts which said attorney believes are relevant to a determination that said case and one or more pending civil or criminal cases should be heard by the same Judge, in order to avoid unnecessary duplication of judicial effort. As soon as the attorney becomes aware of such relationship, said attorney shall notify the Judges to whom the cases have been assigned."

[62]

DI 7 at 20.

20

common and non-controversial plea agreement provisions are not ambiguous.

*Conclusion*

   The Court has considered Kotlyarsky's remaining arguments and concluded that none

has any merit. Accordingly, the motion is denied.

   A certificate of appealability is denied. The Court concludes that any appeal herefrom

would not be taken in good faith within the meaning of 28 U.S.C. § 1915.

   SO ORDERED.

Dated:   May 2, 2019

              Lewis A. Kaplan
           United States District Judge